UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

00 APR 13 AM 8: 47

U.S. DISTRICT COURT
N.D. OF ALABAMA

JENNIFER POUNDERS, )
)
    Plaintiff, )
)
vs. ) Civil Action No. CV-98-S-1897-NE
)
CONSOLIDATED STORES )
CORPORATION and BIG LOTS, )
)
    Defendants. )

**ENTERED**

APR 1 3 2000

### MEMORANDUM OPINION

This action is before the court on defendants' motion for summary judgment (Doc. No. 41), defendants' motion for leave to file a reply brief (Doc. No. 52), plaintiff's motion to strike defendants' reply brief (Doc. No. 55), defendants' motion to strike hearsay (Doc. No. 52), and plaintiff's objections to defendants' motion to strike hearsay (Doc. No. 56). As a preliminary matter, defendants' motion for leave to file a reply brief is due to be denied; accordingly, plaintiff's motion to strike that brief is due to be granted. Further, defendants' motion to strike hearsay is due to be denied, as the statements contested are not offered for the truth of the matter asserted (Fed. R. Evid. 801(c)); accordingly, plaintiff's objections to that motion are due to be sustained. Finally, upon consideration of defendants' motion for summary judgment, briefs, evidentiary submissions, and pleadings,



this court concludes, for the reasons set forth below, that motion is due to be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by showing the court there is an absence of evidence to support the non-movant's case. *See Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (per curiam). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go

2

beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th

3

Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

Consolidated Stores Corporation owns and operates "Big Lots" stores as one of its main two divisions.[1] Plaintiff, Jennifer Pounders, accepted employment as an assistant manager in charge of operations[2] at Big Lots Store #806 in Huntsville, Alabama, during October of 1994. At that time, David Taylor was the store manager. He was replaced by Arthur Leaf two years after plaintiff began her

---

[1] Kay-Bee Toy Stores is the other main division of Consolidated Stores Corporation.

[2] Generally, Big Lots stores employ two assistant managers, one in charge of operations and one in charge of merchandising.

4

employment, during October of 1996.  At all times relevant to this lawsuit, Bruno Lijoi served as the district manager over all Big Lots stores located in north and central Alabama.   In that capacity, Lijoi supervised the operations of approximately fifteen stores, including #806.   Jorja Williams served as the regional human resources manager for Big Lots, and worked out of Atlanta, Georgia.  Her management territory included store #806.  Part of Williams' duties included the prompt investigation and resolution of complaints instituted through Consolidated's "Open Door Policy."[3]      Complaints    regarding    alleged    violations    of

---

[3] The "Open Door Policy" permits employees to voice complaints through a chain of command:

> Consolidated Stores started with a small group of people working very closely together and sharing ideas about how our business could be successful.   Open communication is just as important today as we face new challenges and different types of competition.
>
> We want to know what's on your mind.  Consolidated believes in dealing directly with you and also believes that you have a right to express your opinions, concerns and to ask any questions you may have relating to your job or the Company.  If you have a question or problem, use the Open Door Policy.  Here's how it works:
>
> 1.  Take the question or concern to your Store Manager.
>
> 2.  If you still have a question or concern, call your District Manager.   You can reach your DM by calling the Regional Office.
>
> 3.  If you still have a question or concern or you just feel uncomfortable discussing the issue with one of the managers listed above, contact your Regional Human Resources Manager.

Exhibit 15 to defendants' evidentiary submissions in support of summary judgment (Doc. No. 45), at 12.

Consolidated's equal employment[4] or anti-harassment[5] policies fell

under the ambit of the "Open Door Policy."

The events culminating in the filing of this lawsuit began

with Leaf's assumption of store management duties at Big Lots

#806.[6] According to Pounders, her relationship with Leaf was rocky

---

[4] "Our Company is proud of its philosophy of fair and objective treatment of all associates.  Equal opportunity is given to all associates for all job-related matters, regardless of race, religion, color, sex, sexual orientation, age, national origin, mental/physical disability, or marital status." *Id.* at 15.

[5] The anti-harassment policy provides, in relevant part, that:

Harassment includes discrimination based upon race, religion, color, sex, sexual orientation, age, national origin, mental/physical disability or marital status.  Sexual harassment includes any unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature when:

   1.  The conduct is made either directly or indirectly a requirement in your job.

   2.  Your submission to or rejection of such conduct is used as the basis for employment decisions affecting you.

   3.  The conduct had the purpose or effect of substantially interfering with your work performance or creates an intimidating, hostile or offensive working environment.

   All reports of harassing conduct will be promptly investigated under the direction of the Human Resources Department.  All investigations of alleged harassment will be conducted with the utmost concern for the confidential and personal nature of the allegation and with a high degree of sensitivity to the individuals involved.

   Any associate who is found to have engaged in discriminatory or harassing conduct will be subject to appropriate progressive counseling, up to and including termination.

*Id.* at 16.

[6] Leaf underwent approximately four days of training before taking over management duties at Big Lots #806.  He was trained at another Huntsville Big Lots store for one day, and at a Big Lots store in Pelham, Alabama, for the other

from the beginning.   She disagreed with his management style, as well as his treatment of Big Lots employees.

> Q.   Which ways did you not agree with?
>
> A.   I believed in basically setting by example, not just telling somebody to do something and kind of looking down at them.  He would just demand people to do things and hurry and he was in a hurry to put out freight.  I believe that should be done the correct way the first time and save time in the end.
>
> Q.   Are there any other ways you disagreed with his management ideas and policies?
>
> A.   He used some pretty strong language.  I don't believe that should be done.[7]

Pounders' personal problems with Leaf began during November of 1996, less than one month after he became manager of store #806. According to Pounders, Leaf repeatedly called her a "bitch," "dumb bitch," "dumb ass," or "stupid bitch."  He also referred to her as "honey," "sweetie," or "baby."  This name-calling was "a weekly or daily thing with him," and it was "very rare times that [Pounders] was referred to by [her] name."[8]   Pounders further stated in deposition that Leaf frequently referred to her and two other Big Lots employees, Lisa Graben and Penny Davis, as the "three bitches."

---

three days.

[7] Deposition of Jennifer Pounders, attached as Exhibit 1 to defendants' evidentiary submissions in opposition to summary judgment, at 65-66.

[8] *Id.* at 76.

Q.   What explicit language did he used towards them?

A.   He referred to us as the three bitches of the store.  We were referred to as the damn bitch all the time, each one of us.

. . .

Q.   When did he do that?

A.   On several occasions when he didn't like the way something was done or like if we were stocking.  They were cashiers under me.  I would have to stay at the front of the store with them, a manager or a customer service manager had to stay at the front at all times.

When I was there he would assign me to be at the front of the store with them and he would give us freight to have to put out for the store.  If he didn't like the way we did it, he would say, well, I can tell the damn bitches did this.[9]

Pounders also emphasized Leaf's constant criticism of her work habits.  He continually told Pounders she needed to "loosen up."

Q.   And what was his response?

A.   You just need to loosen up.  I was told a couple of times I needed a good stiff one.  I asked him what he meant by that.

. . .

Q.   What was his reaction to that?

A.   I told him I didn't like him, you know, telling me those kind of things and he said you will get used to it.

---

[9] *Id.* at 74-75.

> Q.   He said you will get used to it?
>
> A.   Used to it.
>
> Q.   Tell me what else he said on that date.
>
> A.   He told me I needed a good stiff one.  I asked him -- I said, what are you referring to.  He said, maybe a good stiff drink, a good fuck and I would be a nicer person. [10]

Leaf allegedly made this last comment to Pounders in her office. No one else was present.  Frank Conway, another Big Lots employee, testified that Leaf made a similar comment to him in the presence of Pounders on another occasion.

> Q.   Did you ever hear him say they needed to go home and have anything else besides a drink?
>
> A.   Yes.
>
> ...
>
> A.   He said they needed to go home and have a stiff drink and get laid and maybe they would have a better attitude.
>
> ...
>
> Q.   Was Jennifer right there when he said that?
>
> A.   I thought she was close to us.  I thought she might could have heard it, but -- I don't know.  I am not saying that she heard it. [11]

---

[10] *Id.* at 90-91.

[11] Plaintiff's supplemental evidentiary submission (Doc. No. 54), at 20-21. It is clear from Conway's deposition testimony that Leaf made the same "stiff drink/good f---" comment to him, but that Conway preferred not to use that language in describing the situation.

In deposition, Leaf denied making any of the above statements, contending he had never "said anything that could be considered derogatory ... to Ms. Pounders."[12]

Pursuant to the "Open Door Policy," Pounders contacted Lijoi in late November or early December to complain of Leaf's statements.[13]  Leaf quickly learned from Lijoi that Pounders had filed a complaint, and began to threaten her with termination if she did not stop making such accusations.

After not hearing back from Lijoi,[14] Pounders contacted Williams.  She informed Williams of the substance of her complaint, and further told Williams that other Big Lots employees took issue with Leaf's management style.  Williams then instructed Pounders to draft a written statement, to collect statements from other Big Lots employees who had complaints, and to forward those statements to her as soon as possible.  Williams believes her first communication with Pounders occurred on December 26 or 27, 1996.  According to Pounders, Leaf continued to threaten her with

---

[12]  Deposition of Arthur Leaf, attached as Exhibit 5 to defendants' evidentiary submissions in support of summary judgment, at 42.

[13]  While Pounders could not pinpoint the exact date she contacted Lijoi, she remembered that it was the day after Leaf made the "stiff drink/good f---" comment in her office.

[14]  According to Pounders, Lijoi told her that he would come to Huntsville to discuss her complaint personally.  He failed to do so, however.  Lijoi does not recall Pounders' initial phone call to him.

termination during this time.

      Q.    Sometime in mid December?

      A.    Mid December.  Then when he found out about the statements that Jorja Williams asked me to get, I'm sure one of the employees in the store had told him about being asked to [write] a statement.

      Q.    Tell me exactly what he said when he threatened to fire you.

      A.    Told me don't go to Bruno on me, we'll handle this ourselves, quit whining about everything, just do your job, don't worry about my job, next time you go to Bruno on me it will be your job.  It made me feel uncomfortable with him.[15]

Pounders followed Williams' instructions by forwarding the statements to her on December 28, 1996.

Leaf gave Pounders two written counselings[16] on January 11th and 12th.  The first was issued for leaving shopping carts outside the store, and the second was for not meeting budgeted payroll hours.  Pounders had never been "written up" until that time.[17]

Pounders filed a criminal complaint against Leaf on January

---

[15] Pounders deposition at 111-12.

[16] Counselings are disciplinary measures taken against Big Lots employees. They can be either verbal or written, and are usually administered by an employee's supervisor.

[17] Lijoi, sometime after March of 1997 (*see infra* note 28) eventually instructed Leaf to remove those counselings from Pounders' file and destroy them, because they reflected "an improper use of the progressive counseling procedure." (Deposition of Bruno Lijoi, attached as Exhibit 3 to defendants' evidentiary submissions in support of summary judgment, at 110.)  Lijoi further acknowledged that Leaf's counselings directed to Pounders were "suspicious" in light of the fact that they occurred "just several days after Ms. Pounders complained and started taking statements about Mr. Leaf."  (*Id.*)

11, 1997, for "harassing communications."  According to Pounders,
Leaf had called her repeatedly during nighttime hours to reiterate
that she should report to work at 7:00 a.m. on January 12th.[18]  Even
after Pounders hung up on Leaf, he continued to call.  Pounders
stated in deposition that Leaf called at least five times after
midnight.

Williams returned from vacation on January 6, 1997, and
reviewed the statements submitted by Pounders.  She then instructed
Lijoi to conduct a preliminary investigation at Big Lots Store
#806.  Lijoi did so during the second full week of January,
approximately ten days after Williams had instructed him to visit
Big Lots #806.[19]  Following his trip to Huntsville, Lijoi told
Williams that she needed to visit the store personally to continue
the investigation.

Lijoi and Williams returned to Big Lots #806 on January 28,

---

[18] Until Leaf called her at home, Pounders was under the impression that
she did not have to work on January 12th.  Pounders felt that Leaf could have
communicated the change in scheduling to her while she was still at work on
January 11th.

[19] Lijoi and Williams differ in the scope and subject matter of Lijoi's
preliminary investigation.  Lijoi stated in deposition that he could not remember
whether he was aware of Pounders' sexual harassment complaint at the time of his
first visit.  He testified that Williams dispatched him to Big Lots #806 "to talk
to associates if there were any problems at all in the store, any problems with
Mr. Leaf in general."  (Lijoi deposition at 60.)  Williams recalls sending Lijoi
to the store to investigate all complaints, including Pounders' claim of sexual
harassment.  During Lijoi's initial visit, Pounders made him aware of the
statements made by Leaf.

1997, and investigated until sometime the next day.[20]  Williams stated in deposition that she and Lijoi interviewed virtually all individuals who had made written statements.  They then spoke with Leaf, and finally with Pounders.[21] Williams concluded that a "huge, huge amount of [the complaints] were related to scheduling issues."[22]  She nevertheless recognized that Leaf's comments to Pounders could not be ignored, especially the "stiff drink/good f---" comment, which Williams described as "a stupid thing to say and it was inappropriate and it was offensive and it had to be dealt with."[23]

Pounders called Williams on February 3, 1997, to complain that Leaf still was making scheduling changes without notification. Pounders told Williams she thought Leaf was making these unannounced changes in retaliation for her act of filing an internal complaint.  After learning that Pounders had consulted a lawyer at the end of January or beginning of February, Leaf accused

---

[20] Leaf stated in deposition that he first learned of Pounders' complaint of sexual harassment approximately one week before Lijoi and Williams came to Big Lots #806 to conduct their full scale investigation.  He further stated that he learned of Pounders' complaint through a Big Lots co-worker, whom he could not identify.

[21] While Pounders informed Williams of the "bitch" and "stiff drink/good f---" comments, Williams did not remember Pounders telling her that Leaf continually referred to her as "honey," "sweetie," or "baby."

[22] Deposition of Jorja Williams, attached as Exhibit 2 to defendants' evidentiary submissions in support of summary judgment, at 84.

[23] *Id.* at 85-86.

595b9e437d2a063e

her of "trying to get rid of him."[24]

Williams issued a notice of "Final Progressive Counseling" to Leaf on or about February 11, 1997, which warned that no form of harassment would be tolerated, and that "any attempt to retaliate or further limit any associate's ability to report problems or discuss concerns with anyone they choose can also result in the termination of this employment."[25]   Leaf nevertheless was given a raise at the end of February.   According to Lijoi, Leaf received the raise because his overall performance as store manager had been successful.   Williams and Lijoi stated in deposition that they did not hear from Pounders again after issuing the notice of "Final Progressive Counseling" to Leaf.[26]   According to Williams, she

---

[24] Pounders deposition at 123.   Leaf disclaims any knowledge of Pounders' retention of a lawyer.

[25] Exhibit 4 to deposition of Jorja Williams, attached as Exhibit 4 to plaintiff's evidentiary submissions in opposition to summary judgment (Doc. No. 47), at numbered page 3.   It is important to note that Leaf had already received one notice of "Final Progressive Counseling" on December 28, 1996, "for leaving merchandise unsecured on the outside of the building while he went to lunch." *Id.* at unnumbered page 1.   While a "Final Progressive Counseling" is usually the final disciplinary step before a Big Lots employee is terminated, Williams stated that any disciplinary step could be repeated in lieu of termination, depending on the circumstances.

> So final progressive counseling does not mean that the next
> violation or the next incident that came up is an automatic
> termination.   We have to evaluate the entire set of circumstances
> before we reach a determination on what would be the appropriate
> next step.

Williams deposition at 60.

[26] Pounders stated in deposition that Williams and Lijoi knew she had spoken with a lawyer, and was prepared to take action if Leaf's behavior was not

"assume[d] the problem [was] solved."[27]

Pounders took a medical leave of absence from March 13, 1997, until approximately June 1, 1997.[28] Upon her return, Leaf continued to call her names.   Pounders stated in deposition that she contacted Lijoi and Williams throughout June to complain of Leaf's behavior.

> Q.   And what time -- what did you tell Jorja Williams or what did you complain to Jorja Williams about during these three to four conversations?
>
> A.   Just the same thing, the name calling, the way he treated me, the way he put me down, maybe I wasn't getting enough, just the way he acted to me in general.
>
> Q.   And what was Jorja's response?
>
> A.   That they were working on the situation, just be patient.  Her comments were the same as Bruno's, maybe I was taking it the wrong way.  And I just asked her how could I take that the wrong way, how many different ways can you take being called those names or have those comments given to you. [[29]]

Pounders claims that Leaf engaged in additional retaliatory behavior by splitting her work shifts, scheduling her for excessive hours, assigning her tasks that did not comport with the physical

---

corrected by filing a charge of discrimination with the EEOC.

[27] Williams deposition at 92.

[28] Before Pounders took medical leave, she discussed the possibility of transfer with Leaf.  Pounders was informed transfer was not an option, because she had received two written counselings in January of 1997.  *See supra* page 11.

[29] Pounders deposition at 136.

limitations imposed on Pounders by her physician, and not permitting her to take a day off to celebrate her son's birthday. Pounders finally resigned her employment with Big Lots on June 23, 1997, by sending an electronic mail message to a number of individuals, including Lijoi and Williams.

Pounders filed two charges of discrimination with the EEOC arising out of her problems with Leaf.  The first, filed on May 27, 1997, claimed discrimination on the basis of sex as well as unlawful retaliation.  In that charge, Pounders contended Leaf retaliated against her for lodging an internal complaint with Williams and Lijoi pursuant to the "Open Door Policy."  The second, filed on August 5, 1997, again alleged unlawful retaliation.  In that charge, Pounders asserted Leaf retaliated against her for filing the first charge of discrimination with the EEOC.[30]

In responding to Pounders' allegations of discrimination in the second EEOC charge,[31] Big Lots requested the EEOC to apply its arguments equally to Pounders' first EEOC charge.

### III. DISCUSSION

Pounders commenced this action on July 24, 1998 (Doc. No. 1).

---

[30] Leaf claimed he first learned of Pounders' contact with the EEOC at a managers' meeting sometime in September of 1997.

[31] Williams stated in deposition that Big Lots only responded to Pounders' second EEOC charge, because that was "the first one that we ... ever saw." Williams deposition at 134-35.

She subsequently amended her complaint twice, first on October 15, 1998 (Doc. No. 12), and again on December 22, 1998 (Doc. No. 18). In the second amended complaint, Pounders alleged that Consolidated Stores Corporation and Big Lots unlawfully discriminated against her in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq*. Specifically, she claimed that defendants, acting through their agent, Leaf, created a sexually hostile work environment, engaged in *quid pro quo* sexual harassment, and unlawfully retaliated against her.[32]  Pounders further sought to hold defendants liable under the law of the State of Alabama for negligent and/or wanton training, supervision, and retention.  The court first will address the propriety of Pounders' Title VII claims,[33] and then move on to her state law claims.

## A.    Title VII Claims

### 1.    Sexually hostile work environment

Title VII makes it unlawful for an employer "to fail or refuse to  hire  or  to  discharge  any  individual,  or  otherwise  to

---

[32] The court does not construe Pounders' complaint to state an independent claim under Title VII for constructive discharge.

[33] In her brief in opposition to summary judgment, Pounders conceded that her claim for *quid pro quo* sexual harassment was due to be dismissed.  *See* Plaintiff's submission in opposition to defendants' motion for summary judgment (Doc. No. 49), at 14 n.11.

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e-2(a)(1).  The Supreme Court concluded, in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." *Id.* at 64, 106 S.Ct. at 2404 (quoting *Los Angeles Department of Water and Power vs. Manhart*, 435 U.S. 702, 707, 98 S.Ct. 1370, 1374, 55 L.Ed.2d 657 (1978)). Encompassed within that "spectrum" is the right of individuals to work in an environment that is not discriminatorily hostile or abusive. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).  According to the *Harris* court: "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.* (quoting *Meritor Savings Bank*, 477 U.S. at 65, 106 S.Ct. at

2405) (internal citations omitted).[34]

The Eleventh Circuit summarizes the elements of a sexually hostile work environment claim as follows:

> (1) the employee must belong to a protected group; (2) the employee must have been subject to unwelcome sexual harassment; (3) the harassment must have been based on sex; (4) the harassment must have been sufficiently severe or pervasive to alter the conditions of employment; and (5) there must be a basis for holding the employer liable for the harassment either directly or indirectly.

*Mendoza v. Borden, Inc.*, 158 F.3d 1171, 1175 (11th Cir. 1998). With regard to the fourth element, a plaintiff must show not only that she subjectively perceived her work environment to be hostile, but also that the conduct creating this environment was sufficiently severe or pervasive to make her perception objectively reasonable.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21-22, 114 S.Ct. at 370.   The Supreme Court

---

[34] The Supreme Court reiterated in *Harris* that Title VII liability for a sexually hostile work environment "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370.

sketched a short list of factors, none of which are dispositive, that aid in determining whether a work environment is "hostile":

> These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.

*Id.* at 23, 114 S.Ct. at 371 (concluding that whether a work environment is hostile depends on an analysis of "all the circumstances").[35]

Viewing the facts in the light most favorable to Pounders, this court finds that the issue of whether Leaf subjected her to a sexually hostile work environment should be decided by a jury. Accordingly, summary judgment is denied.

### 2.   Unlawful retaliation

Title VII also prohibits discrimination based on an employee's decision to pursue legally-protected rights.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has <u>opposed</u> any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or <u>participated</u> in any manner in an investigation, proceeding, or hearing under this subchapter.

---

[35] According to the Eleventh Circuit in *Mendoza*, "'[a] hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits ....'" *Mendoza*, 158 F.3d at 1176 (quoting *Vance v. Southern Bell Telephone & Telegraph Company*, 863 F.2d 1503, 1510-11 (11th Cir. 1989)).

42 U.S.C. § 2000e-3(a) (emphasis supplied).

To establish a *prima facie* case of retaliation under either the opposition or participation clause of § 2000e-3(a), a plaintiff must show three things: (1) statutorily protected expression or activity; (2) an adverse employment action; and (3) a causal linkage between the protected conduct and the adverse action. *See, e.g., Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (outlining Title VII retaliatory discharge framework). When the retaliation claim is based upon the opposition clause of § 2000e-3(a), however, the Eleventh Circuit requires a plaintiff to also demonstrate that any acts committed, or statements made, when protesting an allegedly unlawful employment practice were both subjectively and objectively reasonable; otherwise, as a matter of law, the acts or statements will not be deemed "statutorily protected."

> A plaintiff engages in 'statutorily protected activity' when he or she protests an employer's conduct which is actually lawful, so long as he or she demonstrates "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 960 (11th Cir. 1997). However, it is insufficient for a plaintiff "to allege his belief in this regard was honest and *bona fide*; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Id.*

*Harper v. Blockbuster Entertainment Corporation*, 139 F.3d 1385, 1388 (11th Cir. 1998).[36]

With respect to the requirement of proving an adverse employment action, the Eleventh Circuit recently joined the majority of circuits in concluding that Title VII's prohibition against retaliation extends beyond ultimate employment decisions. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998); *see also Wyatt v. City of Boston*, 35 F.3d 13, 15-16 (1st Cir. 1994) (actions other than discharge held to violate Title VII anti-retaliation provision include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees"). According to the *Wideman* court:

> Read in the light of ordinary understanding, the term "discriminate" is not limited to "ultimate employment decisions." Moreover, our plain language interpretation

---

[36] The Eleventh Circuit explained the policy behind this test in *Little v. United Technologies, Carrier Transicold Division*, as follows:

> A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances."

103 F.3d at 960 (quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978)). *Accord Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990).

> of 42 U.S.C. § 2000e-3(a) is consistent with Title VII's
> remedial purpose.  Permitting employers to discriminate
> against an employee who files a charge of discrimination
> so long as the retaliatory discrimination does not
> constitute an ultimate employment action, could stifle
> employees' willingness to file charges of discrimination.

*Wideman*, 141 F.3d at 1456.

Finally, the Eleventh Circuit has noted that "a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated'" in order to establish the requisite causal linkage.  *Goldsmith*, 996 F.2d at 1163 (citations omitted).

The familiar burden-shifting framework first articulated by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies once a plaintiff establishes a *prima facie* case of retaliation; the burden of production then shifts to defendants, who must articulate a legitimate, nondiscriminatory reason for the challenged employment action.  If that burden is carried, the plaintiff must produce evidence indicating that defendants' stated reason is mere pretext for unlawful discrimination.  *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (noting that a plaintiff must put on enough evidence to permit a jury to reasonably "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct'") (quoting *Cooper-Houston v. Southern*

23

*Railway Company*, 37 F.3d 603, 605 (11th Cir. 1994)). The plaintiff shoulders the ultimate burden of persuasion, of showing that defendants unlawfully retaliated against her. *See Wright v. Southland Corporation*, 187 F.3d 1287, 1292 (11th Cir. 1999) ("In sum, the plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic.").

Viewing the facts in a light most favorable to Pounders, this court finds summary judgment is due to be denied on the issue of retaliation, owing to the existence of genuine issues of material fact. Pounders clearly opposed[37] what she perceived as an unlawful employment practice, Leaf's alleged harassment, by filing a complaint pursuant to the "Open Door Policy." According to Pounders, Leaf committed a litany of retaliatory acts upon learning of her internal complaint, including the issuance of unwarranted written counselings, threats of termination, arbitrary scheduling

---

[37] Pounders also alleges a retaliation claim under the "participation" clause of 42 U.S.C. § 2000e-3(a), based on Leaf's further retaliatory conduct upon being informed of Pounders' initial filing of a charge of discrimination with the EEOC. Aside from Pounders' bare allegations in the EEOC charge itself, there is no evidence that Leaf had knowledge of that charge at the time Pounders left the company. The practical effect of this point is minimal, however, given the breadth of Pounders' retaliation claim under the "opposition" clause. That is, any allegation by Pounders that Leaf retaliated against her for filing a complaint with the EEOC can also be linked to her alleged contact with Lijoi and Williams during June of 1997 pursuant to the "Open Door Policy."

24

changes, and continued verbal intimidation and harassment. Further, Pounders asserts that such conduct, when combined with Leaf's unending disparaging remarks, ultimately led to her constructive discharge. Such allegations are sufficient to warrant denial of summary judgment.

**B.   State Law Claims**

For the reasons set forth in plaintiff's brief in opposition to summary judgment,[38] this court finds that summary judgment is inappropriate as to the state law claims of negligent and/or wanton training, supervision, and retention.

**C.   Conclusion**

Defendants' motion for summary judgment is due to be granted only on plaintiff's Title VII claim premised on *quid pro quo* sexual harassment, and only then because plaintiff abandoned it,[39] but denied on all other claims. An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this *13th* day of April, 2000.

_____
United States District Judge

---

[38] *See* Plaintiff's submission in opposition to defendants' motion for summary judgment, at 35-37.

[39] *See* note 33 *supra*.